UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Shrikant Barot

                    Plaintiff,

            v.                                        22-cv-4823 (NRM) (LKE)

St. John's University                                 **MEMORANDUM AND ORDER**

                    Defendant.

NINA R. MORRISON, United States District Judge:

Plaintiff Shrikant Barot brings this case against St. John's University ("SJU"), alleging a breach of contract, violations of New York General Business Law § 349 ("GBL § 349"), and discrimination on the basis of national origin under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"), on behalf of himself and others similarly situated.

Presently before the Court is SJU's motion for summary judgment and Barot's motion for class certification. For the reasons to follow, the Court grants SJU's motion for summary judgment in full. As this leads to a dismissal of the action, it is unnecessary for the Court to decide Barot's motion for class certification, which is dismissed as moot.

## FACTUAL BACKGROUND

The Court views the following facts "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve[s] all ambiguities and draw[s] all permissible factual

1

inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

In considering SJU's motion for summary judgment and Barot's opposition, the Court has carefully reviewed the parties' Rule 56.1 Statements and has independently assessed the underlying record to determine whether genuine issues of material fact exist and summary judgment is appropriate. *See Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." (quoting *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995))). The Court deems admitted those factual assertions that are not specifically controverted with citations to admissible evidence. *See* Local Civ. R. 56.1(c)–(d); *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004).[1]

## I.    Plaintiff and the Graduate Assistantship Program

Plaintiff is Dr. Shrikant Barot, a former graduate student at SJU, who received his degree in Pharmaceutical Sciences in May of 2021. Def. Response to Pl. Obj. to Def. 56.1 St. ("Def. Resp. 56.1") ¶ 2, ECF No. 54; Pl. Barot Dep. at 26, Anderson Decl. Ex. B, ECF No. 48-2. Barot was a foreign student attending SJU on an F1 visa, Def.

---

[1] The Court has incorporated the necessary relevant facts for analysis of each issue into the discussion section of this order. As such, the following recitation of facts is simply a brief overview of the circumstances that give rise to this action.

Resp. 56.1 ¶ 60, and he applied to SJU sometime in 2014 from India, Pl. Barot Dep. at 21.[2]

SJU offers Graduate Assistantship ("GA") programs, which allow graduate students to "supplement [their] coursework with practical experience." Def. Resp. 56.1 ¶¶ 3–4. Barot participated in the program, which was governed by 14 paragraph Agreements made between the Barot and SJU at the beginning of each school year or summer term, the first of which was entered into between Barot and SJU on July 27, 2016, and the last on July 27, 2020. *See* GA Agreements at 2, 15, Anderson Decl. Ex. C, ECF No. 48-3. The GA Agreements provided that a GA would be required to work up to 20 hours a week; in exchange, SJU provided the GA with tuition credits and a stipend. *See generally id.* Barot participated in the GA program during his time at SJU, from September of 2016 until he graduated and received his degree in Pharmaceutical Sciences in 2021. *See id.*; Def. Resp. 56.1 ¶ 2.

**II.    Barot's Job Responsibilities**

Barot testified at his deposition about various aspects of the work he performed as a GA, and the Court accepts that testimony as true and draws all reasonable inferences from that testimony in Barot's favor for purposes of resolving SJU's motion for summary judgment. Although Barot's contract provided that he would only be required to work a maximum of 20 hours a week, he conservatively estimates he worked 25 hours per week during the school year. Pl. Barot Dep. at 151. On top of

---

[2] All page-number pincites to the record indicate the ECF generated page number, not the internal pagination, *except* for citations to deposition transcripts, which refer to the internal pagination of the transcript.

teaching labs, he had to do extensive prep work for those labs. *Id.* at 37. This included, *inter alia*, setting up for the labs, cleaning up after the labs, doing journal clubs, attending lab prep sessions, and ensuring he fully understood the "lab guide" prepared by Laboratory Director Dr. Felicia Carvalho. *Id.* at 37–39.

In addition to the work he performed while school was in session, Barot was required to be on campus all day every day before each semester to prepare for the lab sessions. *Id.* at 80. At least some semesters, he was required to begin work at least two weeks prior to the actual start of school. *See, e.g.*, 8/1/2019 Festa Email, Anderson Decl. Ex. K ("8/1/2019 Festa Email"), ECF No. 48-11.

Additionally, while the semester was in session, Barot had to be "on-call" 24/7. Pl. Barot. Dep. at 151. There was a general expectation that during the semester, GAs were "on campus during research." Korlipara Dep. at 32, Anderson Decl. Ex. F, ECF No. 48-6. If Barot wanted to leave campus during the semester, he had to get permission from the lab director and find a replacement to teach on his behalf. Pl. Barot Dep. at 124.

### III. Graduate Assistants Complain

Barot and others eventually complained to the faculty at SJU about these working conditions. In 2017, Barot brought his concerns to his research guide. *Id.* at 68. In 2019, he complained to the Department Chair, Dr. Vijaya Korlipara. *Id.* at 69. Dr. Woon-Kai Low, the head of the Pharmacy and Health Sciences Department, then initiated a focus group to address these complaints as "graduate students were communicating that they were having too much of their time taken away from their

4

own graduate studies by the duties associate with acting as GAs."  Low Dep. at 10–11, Anderson Decl. Ex. E, ECF No. 48-5.  In the focus group, Dr. Low found that many students complained about being overworked, with at least one anonymous student saying they worked up to "30 hours a week."  *Id.* at 102–03.  Out of these focus groups, a document was created which reported "[h]igh levels of dissatisfaction" and "[e]xcessive weekly (hourly) workload."  Assessment of Graduate Assistant Job Satisfaction at 6, Anthony Decl. in Opposition to Motion to Certify Class Ex. P, ECF No. 39-16.

## PROCEDURAL HISTORY

Barot brought this action on behalf of himself and all other similarly situated Graduate Teaching Assistants in the College of Pharmacy and Health Sciences ("PHS") at SJU on August 8, 2022.  *See* Compl. at 1, ECF No. 1.  The operative Amended Complaint was filed on November 2, 2022.  *See* Am. Compl., ECF No. 14. The Amended Complaint alleges a class defined as "[a]ll Graduate Teaching Assistants at the College of Pharmacy and Health Sciences at St. John's University from August 16, 2016, to the present," *id.* at 17, and alleges claims in breach of contract and violation of the covenant of good faith and fair dealing, violation of GBL § 349, and violation of the NYSHRL and the NYCHRL for discrimination and disparate impact based on national origin, *id.* at 21–29.

On December 20, 2024, Barot filed his fully briefed motion for class certification.  *See* ECF. No. 36.  On May 16, 2025, SJU filed its fully briefed motion

for summary judgment on all of Barot's claims.  *See* ECF No. 42.  For the reasons to follow, SJU's motion for summary judgment is granted in full.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).  A fact is material "when its resolution 'might affect the outcome of the suit under the governing law.'" *SCW W. LLC v. Westport Ins. Corp.*, 856 F. Supp. 2d 514, 521 (E.D.N.Y. 2012) (ADS) (AKT) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In considering a summary judgment motion, the Court "is required to view the record in the light most favorable to the party against which summary judgment is contemplated and to resolve all ambiguities and draw all factual inferences in favor of that party." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178 (2d Cir. 2008).

"The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact." *Thorpe v. City of New York*, No. 19-cv-5995 (CM) (RWL), 2021 WL 3811238, at *4 (S.D.N.Y. Aug. 25, 2021).  "Once such a showing has been made, the non-moving party must present 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)).  "The party opposing

6

summary judgment 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). "Finally, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant." *Id.*

The only claims brought by Barot on behalf of himself and the putative class are claims sounding in state law: breach of contract, violation of GBL § 349, violation of the NYSHRL, and violation of the NYCHRL. *See* Am. Compl. ¶¶ 71–108. Thus, this Court's jurisdiction is based on the diversity of the parties and the amount in controversy under 28 U.S.C. § 1332(d)(2), and it will apply New York law to Barot's substantive claims. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).

## DISCUSSION

## I.    Breach of Contract and Violation of the Covenant of Fair Dealing

Barot's breach of contract claim is based on his allegations that: (1) he was required to work in excess of 20 hours per week; (2) he was not provided the total class credits he was promised in the contracts; (3) he was required to work two weeks, rather than just one, prior to the start of each semester; (4) he was required to be "on call" 24/7 throughout the semester; and (5) he was required to work during holidays. *See* Am. Compl. ¶ 75. SJU argues both that Barot waived his right to bring a breach

of contract claim *and* that, even if it was not waived, the claim fails on its merits. *See* Def. Mem. at 18–26, ECF No. 45. For the reasons that follow, the Court agrees with SJU in both respects.

### A.    Barot Waived His Breach of Contract Claim

SJU argues that because Barot entered into his first GA Agreement in 2016 and continued to enter into agreements with the same essential terms through his graduation in 2021, he has waived his right to bring a breach of contract claim based on those agreements. *See* Def. Mem. at 19. "[W]here a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach." *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991) (SWK). This form of waiver has long been accepted in New York law. *See, e.g.*, *New York Tel. Co. v. Jamestown Tel. Corp.*, 26 N.E.2d 295, 297–98 (N.Y. 1940) ("Acceptance of benefit under the contract with knowledge of the wrong constitutes a waiver of the wrong."). This well-settled rule is grounded in principles of fairness. It requires a party who has knowledge of another's alleged breach to make that grievance known in a reasonably prompt fashion; the party cannot simply keep that knowledge to herself and then, only after receiving all the benefits of the contract, turn around and sue for breach of contract.

It is undisputed that, for every academic year he worked as a GA, Barot was provided with a standard written contract, which specified that in exchange for working a "maximum [of] twenty hours a week," he "would receive a stipend and

tuition coverage for a specified number of credits per semester." Def. Resp. 56.1 ¶¶ 93b–94b (internal quotation marks omitted).[3]   Barot entered into his first of these agreements in July of 2016 and subsequently entered into six more agreements that reiterated these core terms, covering his time as a GA until the spring of 2021. *See generally* GA Agreements.  The final agreement was entered into on July 27, 2020, and it provided that SJU engaged his services through May 31, 2021. *Id.* at 14.  It is also undisputed that Barot graduated from SJU in May of 2021 as a Doctor of Philosophy.  Def. Resp. 56.1 ¶ 93b.

According to Barot, he told his research guide as early as 2017 that he was working in excess of 20 hours a week. *See* Pl. Barot Dep. at 68.  He made a complaint again in 2018 and took that complaint to the Department Chair in 2019. *Id.* at 69.  He did not make any more complaints in 2020 or 2021. *Id.* at 70.

If SJU's actions in overworking its GAs were to be considered a "breach" of the GA Agreements (which will be discussed *infra*), Barot had knowledge of the breach in 2017.  Thus, it is undisputed that after Barot had knowledge that SJU "breached" the agreements, he continued to perform under the agreements, sign new agreements with the same conditions, and receive the benefits — a stipend and tuition credits — that SJU was to provide him under the agreements.  On its face, this performance

---

[3] There appears to have been a scrivener's error in the drafting of Plaintiff's statement of additional facts not in genuine dispute, in which some of the paragraph numbers duplicate previously used paragraph numbers used by Defendant in its original 56.1 statement.  As such, the Court will designate any paragraph numbers used in the Plaintiff's statements of additional material facts as "b."

and acceptance by Barot appears to be a "waiver of the wrong." *New York Tel. Co.*, 26 N.E.2d at 298.

Barot argues, however, that he did not waive his right to sue for breach of contract because SJU was on notice that its faculty had breached the GA contracts. Pl. Mem. at 27, ECF No. 46. Here, he relies on the rule that "a party to an agreement who believes it has been breached may elect to continue to perform the agreement rather than terminate it, and later sue for breach . . . *where notice of the breach has been given to the other side.*" *Nat'l Westminster Bank*, 130 B.R. at 675 (emphasis supplied); *see also Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 620 (S.D.N.Y. 2004) (AKH) ("If a party chooses to continue performance, it must give notice of breach to the other side, or it waives its right to sue the breaching party."). This general principle, reflected in New York law and that of numerous other states, allows a non-breaching party to "save" a contract by informing the other party of its breach and attempting to induce performance by the breaching party rather than itself ceasing performance. For instance, in *Posik v. Layton*, a Florida appeals court analyzed a situation where two people had entered into a contract which provided that the plaintiff would move into the defendant's house and do the housework in exchange for being written into the defendant's will. 695 So. 2d 759, 760 (Fla. Dist. Ct. App. 1997). After a year of living together, the defendant still had not written plaintiff into the will. The court held that the plaintiff had not waived her right to sue by continuing to perform her end of the bargain during that time, because during that year she expressly informed defendant that she had breached the contract and

attempted to induce performance by "consistently urg[ing] [the defendant] to make the will." *Id.* at 762.

But Barot's evidence of "notice" to SJU, even construed in the light most favorable to him, falls short of the mark. Barot argues that not only did he complain to his research guide and Department Chair about his excessive work hours, as noted *supra*, but at least some GAs made similar reports in a focus group conducted by Dr. Woon-Kai Low in the academic year 2019-2020. *See* Low Dep. at 10–11. One anonymous GA whose comments were cited in the report that emerged from Dr. Low's focus group indicated that "[p]reparation for labs is excessive" and the work required of GAs could take "30 hours a week." Low Dep. at 102. From that focus group study, Dr. Low recorded that 45.5% of GAs reported an "excessive required number of weekly work hours and excessive rigid weekly work hour requirements," and that 72.7% of GAs reported "excessive time required for preparation, including lab prep time, general lab meeting time, workshops and evaluations." Assessment of Graduate Assistant Job Satisfaction at 12.

Barot has certainly presented facts to indicate that faculty at SJU were on notice that at least some GAs believed they were being required to work over 20 hours a week. However, Barot has presented no evidence from which a jury could infer that notice was given to SJU that it was in breach of his contract. A Northern District of California case is instructive and analogous here. Interpreting New York law, the court in *Roling v. E*Trade Securities LLC* found that in order to not waive a claim of breach by continuing to perform and receive benefits under a contract, the non-

11

breaching party must not simply notify the breaching party that they were dissatisfied with their performance, but must specifically notify the party that they are *in breach of contract.* 860 F. Supp. 2d 1035, 1040 (N.D. Cal 2012) ("[W]hile [the plaintiff] expressed unhappiness with the amount of the fee assessment, he never alerted [the defendant] to the fact that he was disputing its legal right to charge the fees in the first place. In short, he did not assert the fees were in breach of the contract."). Similarly, while a reasonable jury could certainly find that Barot "expressed unhappiness" with his working conditions, he has presented no evidence that any of his complaints expressly or even implicitly indicated that he believed SJU was in breach of the GA Agreements. Nor could a reasonable factfinder conclude that because there were anonymous complaints made in a focus group that at least some GAs worked over 20 hours a week, SJU was on notice that it was in breach of one or more terms of Barot's own GA Agreements.

This is especially true because Barot continued to affirm the contracts' validity by entering into successive agreements with the same terms even after making his complaints. *Cf. Melnitzky v. Sotheby Parke Bernet, Inc.*, 750 N.Y.S.2d 859, 859 (N.Y. App. Div. 2002) (finding a claim of breach of contract waived when plaintiff "continued to actively affirm the contract's validity by accepting benefits thereunder"). Indeed, at Barot's deposition, he acknowledged that he did not make any complaints in 2020 or 2021. *See* Pl. Barot Dep. at 70. Thus, after having knowledge of the alleged breach since at least 2017, and even after SJU failed to rectify the situation after his complaints, Barot went on to sign a new GA Agreement

with the same conditions in July of 2020 and made no further complaints.  *See* GA Agreements at 14.   Barot received tuition credits and a stipend in return and graduated in 2021 with a PhD.  *See* Pl. Barot Dep. at 115–16; Def. Resp. 56.1 ¶ 2.

Nor is this a situation in which the non-breaching party (Barot) made a reasonable decision not to terminate the contract immediately after the alleged breach in the hopes that he could induce the breaching party to perform, thereby defeating a defendant's waiver claim.  *See, e.g.*, *Seven-Up Bottling Co. (Bangkok) v. PepsiCo, Inc.*, 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988) (KC) ("[A] party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future.").   Instead, Barot repeatedly *renewed* the contract over the course of three years after he was aware of SJU's alleged breach and continued to reap the benefits from those contracts.  Thus, because he had "actual knowledge of [SJU's] breach and continue[d] to perform under and accept[] the benefits of the contract," *Nat'l Westminster Bank*, 130 B.R. at 675, Barot has waived his claims under breach of contract and the covenant of fair dealing.

## B.    Merits of Breach of Contract Claim

Even if Barot had not waived his claim for breach of contract, SJU would be entitled to summary judgment because no reasonable trier of fact could find for Barot on the merits of that claim.

To establish a claim for breach of contract under New York law, a Plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the

contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). SJU contends that the evidentiary record provides no grounds to find that it breached any term of the seven GA Agreements. Def. Mem. at 20–23. This Court agrees.

The relevant portions GA Agreement provided the following:[4]

"1. The University hereby engages Recipient and Recipient hereby accepts the position of Teaching/Clinic Assistant[] [i]n the Department/Division of Pharm Pharmaceutical Sci for the period beginning 01-SEP-2020 and ending 31-MAY-2021. STIPEND AMOUNT $12000.00 paid in 18 equal semi-monthly installments and tuition coverage for 9 credit(s) per semester.

2. During the term of this Agreement and to the exclusion of any other professional or business commitment, Recipient agrees to devote himself/herself diligently and cooperatively for a maximum of 20 hours per week to the duties of a Graduate Assistant . . . .
. . .
6. The contract term for all standard one-year Doctoral Fellows and Graduate Assistants is one week prior to the first day of classes in the Fall semester through the last day of final exams in the Spring semester. . . . If a Doctoral Fellow or Graduate Assistant is required to work during holidays or breaks it must be stated in his/her GA description and must be approved by the Office of the Provost."

GA Agreements at 14. While Barot claims five separate "breaches" on the part of SJU, they can be grouped into two categories: (1) not giving Barot all the tuition credits to which he was entitled under the contract; and (2) requiring Barot to work

---

[4] The following language is from the final GA Agreement between Barot and SJU, covering the 2020/2021 academic year. All of the agreements contained substantially the same language with different dates, with the one major difference being that the first GA Agreement, for the 2016-2017 academic year, provided tuition coverage for "12 credit(s) per semester." GA Agreements at 2.

more than maximum twenty hours per week provided in the contract.  The Court will address each in turn.

### a.  Tuition Credits

Barot argues that SJU breached the GA Agreements by "fail[ing] to provide tuition coverage for the total number of credits each semester as represented in the GA contracts."  Pl. Mem. at 25.  The GA Agreement for the 2016-2017 academic year stated that SJU would provide Barot with "tuition coverage for 12 credit(s) per semester."  GA Agreements at 2.  The subsequent GA Agreements stated that SJU would provide Barot with nine credits a semester, except for the summer terms, where Barot would be provided with three credits.  *See id.* at 4–14.

Barot does not argue that he was *denied* tuition credits for classes that he took while under contract.  In fact, he confirmed in his deposition that "[w]hile [he] was on [the] graduate assistantship program" he did not pay for "any of the credits" he received "[u]ntil [he] graduated."  Pl. Barot Dep. at 55.  Rather, he argues that "SJU would not permit [him] to register" for the amount of credits for which the contract obligated SJU to provide coverage.  Pl. Mem. at 25.[5]  SJU argues that because Barot has not presented any evidence that it denied him the opportunity to use a tuition

---

[5] In his memorandum of law, Barot also argues that in the first year when the GA Agreement provided for coverage for 12 tuition credits, "it was SJU's policy to provide tuition coverage for a maximum of 9 credits per semester."  Pl. Mem. at 25.  However, the cited portion of the record for that assertion comes from Barot's deposition where he stated that the "underlying policy from school which was stated to me by my colleagues and my advisor was I can only *register* for nine credits per semester."  Pl. Barot Dep. at 129 (emphasis supplied).

credit he intended to use, his claim for breach of contract based on unused tuition credits is "devoid of legal merit." Def. Mem. at 24. This Court agrees.

In attempting to defeat a motion for summary judgment "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the party opposing summary judgment "must produce specific facts indicating that a genuine factual issue exists." *Id.* (internal quotation marks omitted).

At his deposition, Barot testified that if he wanted to take any courses outside of his program, he had "to get things signed [by his] advisors." Pl. Barot Dep. at 128. He then outlined a process in which it was actually the "associate division dean" who would approve the registration and register a student for a course. *Id.* This, he contends "is a very long, bureaucratic process for registering for a course." *Id.* SJU also admits, and it is stated in the GA Manual, that "[t]uition waivers for credit beyond the number required for a student's degree program require approval from his/her supervisor." GA Manual at 4, Gillespie Decl. Ex. 1 ("GA Manual"), ECF No. 44-1.

This would surely be enough evidence for a reasonable jury to conclude that it was procedurally *difficult* for Barot to enroll in classes outside of his program. However, he has not pointed this Court to any evidence that SJU did not *allow* him to register for nine credits a semester (or 12 credits for the 2016-2017 academic year). He does not provide any documentation of attempting to enroll in a course and being denied. He does not provide a single email or any sort of message which indicates

that he attempted to use credits and was denied.  Additionally, in his deposition, he did not even identify a single course that he attempted to enroll in but was not allowed to take.  The closest he comes to offering evidence that he was not allowed to take the number of classes he was contractually allowed to take is that he indicated that, for the entire time he was there, the "underlying policy from the school which was stated to me by my colleagues and my advisor was I can only register for nine credits per semester," Pl. Barot Dep. at 129, and yet in the 2016-2017 academic year he was entitled to 12 credits.  *See* GA Agreements at 2. However, as already stated, he has failed to put forward any evidence that he even attempted to enroll in 12 credits a semester in the 2016-2017 semester and that the attempt was rebuffed, nor has he provided any evidence that such a policy actually existed.  Thus, this Court finds that Barot has failed to provide admissible evidence from which a reasonable jury could conclude that SJU breached the terms of the GA Agreements.

### b.  Extra Hours Worked

Barot also claims that SJU breached the GA Agreements by (1) requiring him to work in excess of 20 hours per week; (2) requiring him to work two weeks, rather than just one, prior to the start of each semester; (3) requiring him to be "on call" 24/7 throughout the semester; and (4) requiring him to work during holidays.  *See* Am. Compl. ¶ 75.

SJU responds by contending that Barot has not provided "any evidence of . . . work . . . that lasted over 20 hours each week," and simply makes "self-serving statements that are implausible."  Def. Mem. at 21 (internal quotations omitted).

Thus, SJU argues, Barot has not created a dispute of material fact as to whether he actually did work over 20 hours a week, was required to be on call, and was required to work two weeks before the start of each semester. *Id.* at 20–23. This Court disagrees. There is a factual dispute on this aspect of Barot's claim, and a jury could find for Barot on this particular prong.

SJU primarily relies on contrary testimony from the deposition of lab director Dr. Felicia Carvalho, in which she indicated that GAs were assigned three labs at most per week, and any given lab could only run for three hours. *See* Carvalho Dep. at 28, Anthony Decl. Ex. B, ECF No. 43-2; *see also id.* at 40 (explaining that each lab would require no more than eleven meetings a semester). While Barot does not dispute this, he testified that there was significant work he was required to perform *outside* of the actual lab hours which added up to more than twenty hours of work a week. *See* Pl. Barot Dep. at 37 ("[O]n top of [the labs], I am doing . . . multiple activities. I am preparing for lab. I am doing proctoring. I am doing journal clubs. . . . Even . . . the physical preparation."). In terms of preparing for the labs, Barot noted that he was required to create a "lab guide" for students, which included "pre-lab" and "post-lab" assignments, which he would have to complete. *Id.* at 39. He indicated that he could be "quizzed on those lab guides at any moment." *Id.* Additionally, Barot presents deposition testimony from Department Chair Dr. Korlipara in which she said that GAs were required to pre-take any quizzes that may be given out and have an understanding of what was going on in the labs. Pl. Korlipara Dep. at 22, Anderson Decl. Ex. F, ECF No. 48-5. Barot testified that, with all this other work,

18

and "being very conservative in terms of considering [his] hours," he estimated that he worked an average of 25 hours per week.  Pl. Barot Dep. at 151.

Barot also presented emails from SJU faculty to show that he was required to begin work as a GA before "one-week prior" to each semester.  *See, e.g.*, 8/14/2018 Festa Email, Anderson Decl. Ex. J, ECF No. 48-10 ("Just a reminder our meeting will be August 23, at 10am . . . . Please be prepared to spend the entire day and everyday after until school starts."); 8/1/2019 Festa Email ("Just a reminder we will be meeting August 22 . . . . Please make sure you have all your days free leading up to the first day of classes (September 4).  We will have many lab meetings before school starts.").  Finally, Barot testified that he had to be on call "24/7."  Pl. Barot Dep. at 85.

While SJU may argue that these statements from Barot are "self-serving," and his calculation of working 25 hours a week is "implausible," Def. Mem. at 21, the Court is required to "view the record in the light most favorable" to Barot, *NetJets Aviation*, 537 F.3d at 178.  In doing so, the Court concludes that Barot has certainly created a dispute of fact as to whether he worked more than 20 hours a week, whether he was required to work more than a week before classes started, and whether he was required to be on call 24/7.

 The question remains, however, whether this is a dispute of *material* fact.  *See Anderson*, 477 U.S. at 248 (holding that a fact is material when it "might affect the outcome of the suit under the governing law").  It is not.  This is because, even if a trier of fact were to credit Barot's claim that he was required to work 25 hours per

week or more, he has failed to identify any term of the contract that SJU actually breached.

To prevail on a claim of breach of contract, a plaintiff must show "non-performance by the other party." *Kramer v. NYC Bd. of Educ.*, 715 F. Supp. 2d 335, 356 (E.D.N.Y. 2010) (JBW) (quoting *RCN Telecom Servs., Inc. v. 202 Centre St. Realty LLC*, 156 F. App'x 349, 350–51 (2d Cir. 2005) (summary order)).  To establish non-performance, the plaintiff "must allege the specific provisions of the contract upon which the breach of contract claim is based." *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (SAS).

Thus, in order to show that SJU breached the contract, Barot must point to a specific provision of the GA Agreement which provides for some benefit that SJU agreed to provide to Barot but did not.  *See U.S. Engine Production, Inc. v. AGCS Marine Ins. Co.*, 769 F. Supp. 2d 626, 628 (S.D.N.Y. 2011) (VM) ("Consideration consists of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other." (internal citations omitted)).  Under the agreement, the interest or profit SJU agreed to provide Barot was (1) a stipend, and (2) tuition credits.  *See generally* GA Agreements.  In return, Barot agreed to "devote himself/herself diligently and cooperatively for a maximum of 20 hours per week to the duties of a Graduate Assistant."  *Id.*  The problem with Barot's breach of contract claim is that he has not alleged that he did not receive his stipend; nor has he presented any facts, as discussed *supra*, from which a trier of fact could conclude that he was denied tuition

credits.  Thus, Barot cannot point to any specific *non-performance* by SJU as per the agreements, as he cannot identify "either a benefit to [him]" that SJU withheld or a "detriment to [SJU]" which it failed to enact.  *Weiner v. McGraw-Hill, Inc.*, 443 N.E.2d 441, 444 (N.Y. 1982).

While it may be the case that SJU required Barot to work more than 20 hours a week, be on call 24/7, and begin work prior to one-week before each semester, none of these actions indicate a lack of performance of its end of the contract.  This is not to say that a GA who was required to work more than 20 hours per week could not bring a claim for breach of contract under different circumstances.  If, for example, Barot had refused to work more than 20 hours a week, or refused to come to campus more than one week prior to the start of classes for additional GA-related preparation work, and in response SJU withheld his stipend or refused to provide tuition credits, Barot might well have a breach of contract claim, because he would have evidence of both his own performance under the contract *and* SJU's subsequent refusal to perform.  However, what Barot is claiming in this case is that he provided SJU with a *greater* benefit than he agreed to provide (*i.e.,* more hours of work), and in response SJU conferred upon him the exact benefit provided by the contract.

Crediting Barot's testimony and drawing all reasonable inferences from it, the Court recognizes that Barot certainly found himself in a difficult situation once it became clear that he was expected to work longer hours than contemplated by his GA agreement.  As a foreign student on a visa, he had little — if any — negotiating leverage while in the middle of pursuing his degree, and might well have feared that

had he taken a hard-line stance and refused to work more than 20 hours a week on the grounds that he believed his contract did not require him to do so, he risked termination of his GA position and revocation of his student visa. However, the Court is limited by the causes of action raised by Barot in his lawsuit, and its only task is to determine whether Barot has presented evidence that satisfies all the elements of those claims. Here, because Barot has failed to allege or demonstrate any specific provisions of the GA Agreements that SJU allegedly breached, SJU is entitled to summary judgment on the merits of Barot's breach of contract claim. *See Magee v. Walt Disney Co.*, No. 19-cv-10274 (AJN) (SDA), 2021 WL 915339, at *2 (S.D.N.Y. Jan. 22, 2021) *report and recommendation adopted*, 2021 WL 4312028 (S.D.N.Y. Sept. 22, 2021) (recommending dismissal of a breach of contract claim where plaintiff claimed he was entitled to more monies when the plaintiff had "not identified any portion of the [contract] that entitles him to any specific payments" (internal quotation marks omitted)).[6]

## II.    New York General Business Law § 349

New York General Business Law § 349 ("GBL § 349") provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the

---

[6] Barot's claim that SJU breached its covenant of good faith and fair dealing presents an arguably closer question. For "[e]ven if a party is not in breach of its express contractual obligations, it may be in breach of the implied duty of good faith and fair dealing . . . when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denies or to deprive the other party of the fruit (or benefit) of its bargain." *Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, 949 N.Y.S.2d 115, 118 (N.Y. App. Div. 2012) (internal quotation marks omitted). However, since this Court has determined that Barot has waived his right to sue under the express or implied provisions of the contract, it need not address the merits of this claim.

furnishing of any service in this state are hereby declared unlawful." GBL § 349. Barot points to three statements from SJU which he argues are violations of GBL § 349: (1) SJU's website, which describes the responsibilities of a GA as "assisting the students with lab techniques, preparing for labs, proctoring exams and participating in lab meetings and lab trainings," GA Descriptions at 2, Anderson Decl. Ex. R, ECF No. 48-18; (2) the portion of the website which represents that "Graduate Assistants work up to 20 hours per week," GA Manual at 3; and (3) the portion of the website which claims that "St. John's University does not discriminate on the basis of race, color, [or] national origin . . .," GA Descriptions at 3. Barot claims that these statements are all in violation of GBL § 349 because: (1) they fail to disclose that there are additional responsibilities, like being on call 24/7 and starting work two weeks prior to the start of each semester; (2) they incorrectly state that the maximum amount of hours a week worked by a GA is 20; and (3) they falsely claim that they do not discriminate on the basis of national origin. *See* Pl. Mem. at 31. SJU argues that Barot's claim under § 349 is time-barred. The Court agrees.

"A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000). The statute of limitations on a GBL § 349 claim is three years. *See Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*, No. 04-cv-704 (RPP), 2005 WL 1214281, at *16 (S.D.N.Y. May 20, 2005). "Accrual occurs when plaintiff is injured by the deceptive act or practice

23

that violated the statute.  Such injury occurs when [] all of the factual circumstances necessary to establish a right of action have occurred, so that the plaintiff would be entitled to relief." *Statler v. Dell, Inc.*, 775 F. Supp. 2d 474, 484 (E.D.N.Y. 2011) (JW) (internal citations and quotation marks omitted).

Barot testified that he applied to SJU sometime in 2014, Pl. Barot Dep. at 21, that he began the GA program in 2016, *id.* at 23, that and that he learned about the GA program from various sources, including the SJU website, prior to arriving in the U.S., *id.*  As discussed *supra*, Barot also testified that he first complained about working more than 20 hours per week in 2017.  *Id.* at 68.  This means that, at the very latest, Barot's claim accrued sometime in 2017, *i.e.,* when he asserts that he had both relied on the information on SJU's website and was injured by that reliance.  *See Gaidon v. Guardian Life Ins. Co. of America*, 750 N.E.2d 1078, 1083 (N.Y. 2001) (holding that a claim under § 349 accrued when plaintiffs' "respective injuries occurred as a result of the alleged statutory violations.").  Barot filed this action more than four years later, on August 16, 2022. *See* Compl.  Thus, on its face, his GBL § 349 claim is barred by the applicable three-year statute of limitations.

Barot argues, however, that the statute of limitations should be tolled due to the "continuing violation" doctrine as "SJU's deceptive representations about the GA program and its non-discriminatory practices on its website have continued to this day."  Pl. Mem. at 33.  "Where a § 349 claim is based on a series of allegedly deceptive acts . . . the continuing violations doctrine . . . effectively tolls the limitations period until the date of the commission of the last wrongful act." *Breitman v. Xerox Educ.*

*Servs., LLC*, No. 12-cv-6583 (PAC), 2013 WL 5420532, at *4–5 (S.D.N.Y. Sept. 27, 2013).  Thus, even if a plaintiff's original reliance on a misrepresentation is outside of the statute of limitations, if the misrepresentation continues and the harm from that misrepresentation is repeated, the claim may not be time-barred.

For example, in *Harvey v. Metropolitan Life Ins. Co.*, a New York appeals court examined a case where a customer was misled into believing their children would be covered by insurance after their 25th birthdays, and that customer continued to pay premiums after the children turned 25, mistakenly believing that they were still covered.  827 N.Y.S.2d 6, 6 (N.Y. App. Div. 2006).  The court there found that, even though the youngest child had turned 25 four years prior to the commencement of the suit, the continuing violations doctrine applied because each time the customer paid the premium, believing that his children were covered, the injury continued.  *Id.* Similarly, in *Stanley v. Direct Energy Servs., LLC*, a court in the Southern District of New York analyzed a claim where the plaintiff was continually billed a monthly rate for electricity supply that plaintiff alleged was not the "competitive pricing" it had been promised.  466 F. Supp. 3d 415, 421–22 (S.D.N.Y. 2020) (KMK).  The court found that, even though the allegedly deceptive notice which indicated that it would charge "competitive" pricing was received more than three years prior to the commencement of the action, because "each payment pursuant to each charge constitute[d] an individual wrongful act," the continuing violations doctrine applied.  *Id.* at 432–33 (internal quotation marks omitted).

Barot's situation is different.   Unlike in *Harvey*, where the plaintiff continued to pay the insurance premiums believing his children were covered, *see Harvey*, 827 N.Y.S.2d at 6, Barot has testified that he complained about the working conditions in 2017, and thus could not have reasonably continued to rely on the allegedly misleading statements on SJU's website when making his decision to continue working in the GA program year after year.   The court's reasoning in *Basso v. New York University* is instructive and on point.   No. 16-cv-7295 (VM), 2017 WL 1019505 (S.D.N.Y. Feb. 24, 2017).   There, students who attended Tisch Asia brought a claim against New York University ("NYU") for making representations that "the faculty, equipment, and facilities" at Tisch Asia would be of the same quality as that of its campus in New York.   *Id.* at *1.   The students claimed that this was not the case and brought a claim under GBL § 349.   *See id.* at *5.   While the students enrolled in Tisch Asia more than three years prior to bringing the claim, since their second and third years of attendance fell within the statute of limitations, they claimed that the continuing violations doctrine applied.   *Id.*   The Court disagreed, reasoning that after the first year, when the students learned that NYU's representations were misleading, "any continued reliance on the representations . . . would be unreasonable."   *Id.*   The same is true in Barot's case.   No reasonable jury could conclude that he reasonably relied on the representations on the SJU's website regarding the GA program after he had actively participated in that program for at least two years and learned first-hand what the reality of the work responsibilities were.

Perhaps recognizing this potential barrier to proceeding with his GBL § 349 claim, Barot claims that the injury from the misrepresentations was not necessarily his reliance on them, but rather that the misrepresentations enabled SJU to continue to recruit more students working as GAs "to satisfy its labor needs without having to reform its exploitative practices," harming Barot up to the point of his graduation. Pl. Mem. at 34. It is true that the reliance on a misleading statement is just one way an individual can be injured under GBL § 349, as a plaintiff simply "must show that the defendant's material deceptive act caused the injury." *Stutman*, 731 N.E.3d at 612 (internal quotation marks omitted). Barot contends that his injury is similar to a "price premium" injury, where a defendant's misrepresentations cause the general price of a product to be artificially inflated, harming a plaintiff even if that plaintiff did not rely on the misrepresentations. Pl. Mem. at 34. A price premium injury has indeed been recognized in the context of GBL § 349 claims. *See In re Columbia Coll. Rankings Action*, No. 22-cv-5945 (PGG), 22-cv-6597 (PGG), 2024 WL 1312511, at *12 (S.D.N.Y. Mar. 26, 2024) (recognizing the plaintiffs suffered a harm in paying a tuition that was artificially inflated due to allegedly false data contributing to Columbia's ranking).

However, at summary judgment, a nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted). While it may be hypothetically possible that the statements made on SJU's

27

website induced more people to apply for the GA position, thus allowing SJU to continue its allegedly "exploitative practices," Barot has pointed to *no* evidence adduced in discovery which could lead a reasonable jury to infer this causal chain. For example, Barot has not pointed the Court to any evidence that other students relied on the allegedly misleading statements in choosing to apply to the GA program, nor has he presented any documentation or testimony from which it could be inferred that SJU's decision to continue its policies around GA workload was in any way impacted by the number of GA applications it continued to receive. While the Court must view all the evidence presented in the "light most favorable" to Barot, *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 374 (S.D.N.Y. 2015) (AJN), there still must be *some* evidence supporting Barot's claims. Put simply, Barot has presented no evidence to support his quasi "price-premium" theory of harm, and thus this Court cannot find a continuing violation of GBL § 349 based on that harm.

Thus, because Barot's reliance on the allegedly misleading statements occurred outside of GBL § 349's three-year statute of limitations, and he has presented no evidence to support his claim that the continuing-violations doctrine should apply, summary judgment must be granted in favor of SJU on this claim.

## III.    Claims Under the NYSHRL and NYCHRL

Barot brings claims under the NYSHRL and NYCHRL for both disparate treatment and disparate impact based on national origin. In support of these claims, Barot points to evidence that most of the GAs were foreign students on visas. *See* Korlipara Dep. at 62–63. While Barot acknowledges that all GAs, regardless of their

citizenship, were required to work in excess of 20 hours a week, Pl. Mem. at 35, at his deposition, Barot stated that F1 visa holders got "more" assignments than U.S. citizen GAs.  Pl. Barot Dep. at 144.  He also testified that foreign students have unequal bargaining power compared to U.S. citizen GAs.  *See id.* at 67 ("[I]if my F1 is cancelled, then I get kicked out of this country."); *id.* at 75 ("People who are citizens, they had . . . more leverage."); *id.* at 75–76 ("So the person who is in . . . charge . . . — they know that you are a citizen, or [that] you are an international student.  So they can — they would retaliate harder against an international person and not against a citizen.").  But Barot has not provided sufficient evidence to sustain either a discrimination or a disparate impact claim.

Courts must analyze "NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (internal citations and quotation marks omitted).  "The NYCHRL's liability standards have always been held to be more lenient" than the federal standards, and "the NYSHRL's standards, which have always been held more lenient than those of § 1981, today remain no less demanding than those of the NYCHRL."  *Kurtanidze v. Mizuho Bank, Ltd.*, No. 23-cv-8716 (PAE), 2025 WL 1898927, at *9 (S.D.N.Y. July 9, 2025); *see also Moore v. Metro. Transp. Auth.*, 999 F. Supp. 2d 482, 500 (S.D.N.Y. 2013) (DAB) (noting that the NYCHRL remedial purposes are "uniquely broad" (quoting *Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29, 34 (N.Y. App. Div. 2011)).

Thus, "if [Barot's] . . . national origin-based claims fail under the NYCHRL's more permissive standard of liability, it follows that the parallel claims under . . . the NYSHRL similarly fail." *Kurtanidze*, 2025 WL 1898927, at *9. As the Court finds that Barot's claims do fail under the NYCHRL, it will refrain from conducting a separate analysis under the NYSHRL.

### a. Discrimination

Section 8-107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice for an employer or an employee or agent therefore, because of the actual or perceived . . . race . . . [or] national origin . . . of any person . . . [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(a)(1). "[T]he plaintiff need only show differential treatment — that she is treated 'less well' — because of a discriminatory intent." *Mihalik*, 715 F.3d at 110. In this sense, a plaintiff proceeding under the NYCHRL is not necessarily tethered to the *McDonnell Douglas* balancing test, as "summary judgment dismissing a claim under the NYCHRL should be granted only if no jury could find [a] defendant liable under any of the evidentiary routes — *McDonnell Douglas*, mixed motive, direct evidence, or some combination thereof." *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 30 (N.Y. App. Div. 2012) (internal quotation marks omitted). "Under the NYCHRL, a discriminatory motive can be show either by pleading direct evidence of discrimination, . . . or by pleading facts showing that comparators were treated better than the plaintiff was." *Kurtanidze*, 2025 WL 1898927, at *12. However, "a plaintiff's mere subjective belief that he was

discriminated against because of his [national origin] does not sustain a [national origin] discrimination claim." *Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 309 (E.D.N.Y. 2014) (MKB) (internal quotation marks omitted).

Direct evidence of discrimination can come in many forms, including comments directly admitting that an impermissible purpose was considered in making an employment decision, *see Barbano v. Madison Cnty.*, 922 F.2d 139, 143 (2d Cir. 1990) (finding direct evidence of discrimination when an interviewer indicated he "would not consider some woman for the position" (internal quotation marks omitted)), or a supervisor implementing an informal policy with explicit racial considerations, *see Ames v. Cartier, Inc.*, 193 F. Supp. 2d 762, 768–69 (S.D.N.Y. 2002) (CBM) (explaining that a store manager implying that "white male customers were to be served by white female sales associates" was direct evidence of discrimination). Barot has not pointed to any such direct evidence of discrimination here.

Rather, Barot argues that he has made a *prima facie* showing of discrimination by presenting evidence that members of a similarly situated group were not subject to the same conditions as F1 visa holders. *See* Pl. Mem. at 35. In support of this contention, he points to his deposition testimony in which he said that F1 visa holders were assigned more work than citizen GAs. *Id.* He also argues that because foreign GAs had less bargaining power than citizen GAs, and they were unable to receive compensation for work over 20 hours a week, "SJU . . . exploited Plaintiff and other foreign GAs." *Id.* at 36. However, aside from his own broad allegation that foreign GAs were assigned more work than U.S. citizen GAs, Barot has offered no actual

31

evidence of a U.S. citizen GA being treated better than a foreign GA.  He has not identified a single U.S. citizen GA who worked fewer hours than a foreign GA, was not required to be on call 24/7, or was not required to begin work prior to one-week before the start of the semester.  While it may be that SJU was in a position to exploit foreign GAs as compared to U.S. citizen GAs because of their status, the claim that it *did* exploit foreign GAs or otherwise treated citizen GAs preferentially is unsupported by any evidence beyond Barot's own conclusory statements.   While the Court recognizes that it is a low bar to overcome summary judgment on a discrimination claim under the NYCHRL, a plaintiff cannot "rely on conclusory statements, conjecture, and inadmissible evidence, but instead must offer some hard evidence showing that his version of the events is not wholly fanciful."  *Uttarwar v. Lazard Asset Mgmt. LLC*, No. 22-cv-819 (DEH), 2024 WL 1251177, at *4 (S.D.N.Y. Mar. 22, 2024) (internal citations and quotation marks omitted).  Because the Court finds that Barot's discrimination claim under the NYCHRL does not survive summary judgment, it must dismiss his NYSHRL claim as well.

### b.  Disparate Impact

The NYCHRL protects against policies or practices that "result[] in a disparate impact to the detriment of any group protected" by the NYCHRL.  N.Y.C. Admin. Code § 8-107(17)(a)(1).  The rule against disparate impact is designed to protect against policies that are "fair in form, but discriminatory in operation."  *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)).  While statistical evidence may not be strictly necessary to

prove a disparate impact claim, "statistical proof almost always occupies center stage in a *prima facie* showing of a disparate impact claim." *Fitchett v. City of New York*, No. 18-cv-8144 (PAE), 2021 WL 964972, at *23 (S.D.N.Y. Mar. 15, 2021) (quoting *Adorno v. Port Auth. of N.Y. & N.J.*, 258 F.R.D. 217, 233 (S.D.N.Y. 2009) (DC). Where statistical evidence may be impossible to obtain, such as "in cases involving small or marginal samples, other indicia raising an inference of discrimination must be examined." *Waisome v. Port Auth. of N.Y. & NJ.*, 948 F.2d 1370, 1379 (2d Cir. 1991).

Barot's disparate impact claim must be dismissed for substantially the same reasons as his discrimination claim. Not only has he produced no *statistical* evidence that tends to show that SJU had policies or practices which had a disproportionately negative effect on foreign students, he has produced no other evidence on this point. Barot's claim that "foreign GAs were impacted worse than citizen GAs because they lacked recourse and alternative work opportunities," Pl. Mem. at 36, is just that — a claim. At the summary judgment stage, more is required. Thus, Barot's NYCHRL and NYSHRL disparate impact claims must be dismissed. *See, e.g.*, *Fitchett*, 2021 WL 964972, at *24 (dismissing a disparate impact claim under NYCHRL at summary judgment where plaintiff had "not identified a facially neutral policy that, with the data subjected even to minimal rigor, . . .yielded racially disparate" impacts).

## CONCLUSION

For the foregoing reasons, the Court grants SJU's motion for summary judgment in full. As this outcome disposes of Barot's lawsuit in its entirety, his motion to certify the proposed class (ECF No. 36) is moot. The Clerk of Court is

respectfully directed to terminate Barot's motion for class certification and to close this case.

SO ORDERED.                                     /s/ Nina R. Morrison

                                                NINA R. MORRISON
                                                United States District Judge

Dated: September 18, 2025
       Brooklyn, New York

34